IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>APPROXIMATELY $44,875 IN UNITED )<br>STATES CURRENCY SEIZED FROM )<br>DYMOND THOMAS ON APRIL 6, 2022 )<br>AT THE CHARLOTTE-DOUGLAS )<br>INTERNATIONAL AIRPORT ) | **Civil No. 3:22-cv-637** |

## **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

### INTRODUCTION

1. This is a civil action *in rem* against $44,875 in United States currency seized from Dymond Thomas ("Thomas") on April 6, 2022 at the Charlotte-Douglas International Airport (the "Currency").

2. Thomas spent at least $7,536 on at least thirty-five flights between the east coast and California (a known drug source location) in the roughly two years prior to the seizure, often purchasing tickets last minute with short turnarounds for the trips. When interviewed by law enforcement at the CLT airport after the Currency was discovered hidden amongst three of his bags (following an alert from a drug detection K9 to the checked bag), Thomas claimed to be a party promoter and dog seller, though he has not shown any proof of legitimate income for the first and admitted to law enforcement he lied in claiming the latter, having never actually sold

1

dogs. And as to the purported source of the Currency, Thomas has put forth an inconsistent, contradictory, and changing narrative, essentially offering up everything but the kitchen sink: from online gambling winnings to government pandemic assistance to gifts from family members to money invested in a friend's business to being paid to play college football. Yet, Thomas has been unable to provide any documentation actually connecting the Currency to any of these purported sources (or any other for that matter).

3.     $44,875 is an unusually large amount of money to carry in cash (though Thomas did not know exactly how much he was carrying), and if the Currency was legitimately derived or intended to be used for any legal purpose in California, transporting it across the country in cash form made little sense. *See, e.g., United States v. $183,791.00 in U.S. Currency*, 391 Fed. Appx. 791, 795 (11th Cir. 2010) ("Although a large amount of cash alone is insufficient to meet the government's burden, it is highly probative of a connection to some illegal activity . . . legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. In contrast, drug rings do often utilize couriers to transport large amounts of cash in rubber-banded bundles.") (internal quotations and citations omitted).

4.     A simpler, more plausible explanation exists as to why someone who squarely fits the profile of a drug courier would be transporting rubber-banded bundles of cash in denominations consistent with street-level narcotics sales with no

bank bands to a known drug source location: it is money derived from and/or intended to be used in drug trafficking.

5. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## NATURE OF THE ACTION

6. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

7. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

8. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

9. The Currency has been seized and is now within the Western District of North Carolina.

10. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent ("SA") Daniel Leal,

3

Case 3:22-cv-00637-GCM   Document 1   Filed 11/23/22   Page 3 of 14

this action seeks the forfeiture of all right, title, and interest in the Currency.

## FACTS GIVING RISE TO FORFEITURE

*The interdiction*

11. On April 6, 2022, Dymond Thomas was traveling to Los Angeles (a known drug-source location) on American flight 1364.

12. That day, HSI Task Force Officer ("TFO") Johnathan Cerdan, TFO Gregory Altizer, and SA Daniel Leal were conducting an interdiction operation at the CLT airport. The interdiction operation included, among other things, the deployment of K9 Cali, a properly trained and certified narcotics detection canine, to conduct open-air sniffs of checked suitcases prior to their being loaded onto AA flight 1364.

13. K9 Cali alerted to a suitcase belonging to Dymond Thomas. The suitcase was taken to the passenger area for AA flight 1364 to locate Thomas.

14. Thomas was contacted at the gate, and granted consent for law enforcement to search his checked suitcase, carry-on bag, and backpack.

15. Each bag of Thomas's contained a large amount of rubber-banded bulk cash, together comprising the Currency:



16. The checked suitcase contained what was later determined to be $15,876 in rubber-banded cash inside a canvas bag:



17. The carry-on contained what was later determined to be $19,000 in rubber-banded cash located inside a black hoodie:



18. The backpack contained what was later determined to be $10,000

5

located inside the bag and/or another small black bag contained therein:



*Thomas's airport interview*

19. Thomas told law enforcement that he lived in Los Angeles and had been visiting his mother in Florida.

20. Thomas claimed that he worked as a party promoter, showing to SA Leal what purported to be an image on his phone of a contract between him, McKinley Clark, and (the rapper) Polo G for $32,000.

21. But, when asked for the name of his business, Thomas would not respond to the question, and was unable to provide a business registration, tax documents, financial documents, or any other documentation/information to show that he was operating a legitimate business.

22. He then claimed to sell dogs (French bulldogs and pit bulls), but when asked if he had a license to do so, Thomas admitted that he did not sell any dogs (contradicting his prior statement).

23. Thomas claimed he purchased his airline ticket three to four days prior,

and that he had travelled between the east and west coast six to seven times, and flew with large amounts of currency "all the time."

24. This was a lie: airline records show Thomas purchased his ticket the day of travel.

25. Thomas told law enforcement he was traveling with $40,000, and when ask where the money came from, Thomas stated that he had been paid to play college football and was involved in sports betting. Thomas later clarified that he was paid $3,000 per month to play football at California University of Pennsylvania from 2014 to 2018 because he received student loans in excess of his tuition.

26. When SA Leal asked Thomas if the money came from banks, Thomas originally replied yes, but after SA Leal pointed out Thomas had not provided any bank receipts or statements showing cash withdrawals, Thomas then said he had taken some of the money out of a safe.

27. Thomas next stated that $17,000 of the cash came from a sports bet he had won, and the rest had been taken out of a bank. Then, Thomas said $9,000 of the cash had come from a different bet.

28. To support his story, Thomas showed SA Leal an image of what appeared to be a $50 online bet using Fanduel Sportsbook made by his cousin Bryce Trageser, with winnings of $17,158.54 (from which $4,106.04 in federal taxes were withheld). Thomas claimed Trageser placed the bet for him online because California prohibited such betting.

29. Thomas was asked if he could show how the $13,052.49 in purported

winnings was converted to cash, and Thomas could not.[1]

30. Thomas then showed SA Leal his online bank information, but this simply revealed an account with low beginning and ending balances for the recent month shown, and SA Leal did not observe any significant cash withdrawals.

31. Thomas also showed SA Leal $4,000 in Zelle payments he received in March 2022, but did not specify the source of the money.

32. Thomas additionally claimed he had saved some money from college and invested it in a friend's company called Stocic, and that some of the money came from there, but did not produce any documentation supporting this claim either.

33. Thomas later stated he received $10,000 for Pandemic Unemployment Assistance, and part of the cash came from that.

34. Thomas was asked if law enforcement could look at his text messages to see if there was any information related to narcotics or criminal activity, and Thomas declined consent.

35. When asked if he used marijuana, Thomas admitted he did.

36. Thomas also has a prior conviction for marijuana possession as well as retail theft.

37. Thomas was advised the Currency would be seized, and as SA Leal was filling out the seizure form, Thomas stated that he did not know the exact amount of cash.

---

[1] Later that day, SA Leal spoke to Trageser on the phone, and Trageser claimed he gave his cousin Thomas approximately $13,000, which included $5,000 in Zelle transfers and the remaining $8,000 in cash, which Trageser purportedly withdrew $500 at a time from multiple ATMs.

38. At the end of his encounter with law enforcement, Thomas looked at a TFO's body worn camera and stated that the money came from his cousin Bryce Trageser, his cousin Matthew George, from college football, and from FanDuel sports betting.

***The Currency's second K-9 alert, composition, and deposit***

39. The Currency was subsequently placed into three independent lineups of scent boxes.

40. K9 Benny, who is a properly trained and certified drug detection canine, was deployed to conduct a sniff of the blind lineups.

41. As to each lineup, K9 Benny positively alerted to the odor of narcotics only on the boxes containing the Currency seized from Thomas.

42. The Currency was transported to Loomis, where it was counted and deposited into an account established to hold seized funds.

43. Both the Currency's packaging in rubber-band bundles and denominations (33 five-dollar bills, 124 ten-dollar bills, 1966 twenty-dollar bills, 39 fifty-dollar bill, and 22 hundred-dollar bills) are consistent with cash involved in drug trafficking, rather than cash withdrawn from a bank.

***Thomas's travel and CashApp history***

44. Thomas's travel history is consistent with that of a drug or money courier (indeed, Thomas admitted to previously flying with large amounts of currency).

45. California is a known drug source state for the east coast. Airline records

reveal that from December 2020 through April 2022—*i.e.* through the COVID-19 pandemic—Thomas booked thirty-five flights between the east coast and California, reflecting at least 18 round trips by Thomas (either via flights or some combination of car and air travel).

46. On six occasions, Thomas returned from California after two days there, and on eight occasions, he returned after three days there.

47. Thomas also purchased many of his airline tickets last minute (as he did with the flight underlying the seizure), spending at least $7,536 on airline tickets during this time period.

48. Further, records regarding Thomas's CashApp account show that from May 2021 to May 2022, Thomas had roughly 1,400 attempted peer to peer transactions, transfers, or payments, with the vast majority of payment comments being vague or nonexistent, but with some consisting of references to marijuana or illicit drugs, such as zip, woods, and emojis such as the flame, snowflake, flexing arm, 8-ball, and 100 sign. There appears to be no apparent legitimate business connection to Thomas's voluminous CashApp activity.

***Thomas's alleged source of the Currency changes***

49. Inconsistent with his prior statements to law enforcement regarding the Currency's source, Thomas claimed in his administrative petition to U.S. Customs and Border Protection to have (a) received the cash from family members ($9,000 from his mother in August 2021 for moving expenses and $13,500 from his father in August 2020 as a belated graduation gift after his father purportedly won the

Pennsylvania lottery), and (b) from the previously-referenced bet that was placed via FanDuel by his cousin.

50. Thomas also claimed in his administrative petition that the Currency represented his "savings to cover my moving expenses." Notably though, the claimed sources of cash—the $9,000, $13,500, and $13,052.49—that Thomas purports to have received fall roughly $10,000 short of the amount of the Currency, and Thomas has offered no documentation or indication supporting the notion he was actually moving to Los Angeles—indeed, the letter he included with his administrative petition months after seizure listed the same Pennsylvania address that was on his driver's license at the time of seizure.

51. Moreover, Thomas was asked, *inter alia*, in the administrative phase if he could provide documentation showing a legitimate source of income, which Thomas declined to provide.

### FIRST CLAIM FOR RELIEF – THE $44,875 IN CURRENCY
### (21 U.S.C § 881(a)(6))

52. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 51 above as if fully set forth herein.

53. The $44,875 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

54. Upon information and belief, the following persons may claim an interest in the Currency seized on April 6, 2022:

Dymond Thomas
419 Cedar Street
Chambersburg, PA 17202

*With courtesy copy to:*

Leslie M. Sammis, Esq.
Sammis Law Firm
1005 N. Marion Street
Tampa, FL 33602

## CONCLUSION AND PRAYER FOR RELIEF

55. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 23rd day of November, 2022.

                                              DENA J. KING
                                              UNITED STATES ATTORNEY

                                              <u>/s/ Seth Johnson</u>
                                              J. Seth Johnson
                                              NC Bar No. 53217
                                              Assistant United States Attorney
                                              Suite 1650, Carillon Building
                                              227 West Trade Street
                                              Charlotte, North Carolina 28202
                                              Telephone: (704) 338-3159
                                              Email: seth.johnson@usdoj.gov

# VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the __22__ day of November, 2022.

                                        DANIEL S LEAL
                                        Digitally signed by DANIEL S LEAL
                                        Date: 2022.11.22 12:30:13 -05'00'

_____
Special Agent Daniel Leal
Department of Homeland Security,
Homeland Security Investigations